## Case No. 12,908.

### SINNOTT v. The DRESDEN.

[Newb. 474.] [1]

District Court, E. D. Louisiana. March, 1854. April 18, 1854.

COLLISION— NAVIGATION ON MISSISSIPPI—NARROW CHANNEL—DESCENDING AND ASCENDING STEAMERS.

1. There is no general rule of navigation on the Mississippi more uniformly observed by pilots of steamboats than that which requires the descending boat to run down the bend where she finds the strongest current and the deepest water, and the ascending boat to hug the bar as close as she can with safety, in order to avoid the resistance of the current.

[Cited in Shirley v. The Richmond, Case No. 12,795.]

[See Bates v. The Natchez, Case No. 1,102.]

2. Where it appears that two steamboats were meeting on the Mississippi river and the pilot of the ascending boat gave the signal of two taps of his bell, thereby indicating his determination to steer to the larboard in order to take the bar shore, and his signal was answered by the pilot of the descending boat also with two taps, thereby indicating his acquiescence in the propriety of the signal, it was the duty of the latter promptly to steer to the larboard in order to avoid a collision.

3. Rule 3 of the rules and regulations adopted by the board of supervising inspectors in compliance with the requisitions of the act of congress approved 30th of August, 1852, purports to be a rule to regulate the movements of steamboats meeting in fogs and narrow channels. The term "narrow channel" is absurd when applied to that of the Mississippi river at any stage of water or at any point below the mouth of the Ohio, and the term as used in the rule doubtless refers to the channels of the shoots, so called by river-men, which running off from the main river form islands by falling into it again.

4. When two steamboats are meeting on the Mississippi river, and there is danger of collision, it is the duty of the descending boat as a general rule, to ring her bell and shut off her steam; and it is the duty of the ascending boat to do the maneuvering.

5. On application for a rehearing, held, further, that declarations of witnesses as to distance in the night time must be received with many grains of allowance. Conclusions drawn by witnesses as to objects discerned at a distance, are uncertain.

[This was a libel by J. C. Sinnott, owner of the steamboat Georgia, against the steamboat Dresden, for damages sustained by collision.]

Mr. Finney, for libelants.

Mr. Reese, for respondents.

McCALEB, District Judge. In this case, it appears from the evidence that the steamboat Georgia, of which the libelant was owner, came into collision with the steamboat Dresden in the Mississippi river, at a point about four miles below the mouth of the

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[1] [Reported by John S. Newberry, Esq.]

Ohio. The Georgia was descending and the Dresden ascending at the time of the occurrence which happened at about 11 o'clock at night on the 3d of August last. The proper position for descending boats at the place of collision is from one hundred and fifty to two hundred yards from the Kentucky shore. The distance is increased by the testimony of some of the pilots to from two hundred to two hundred and fifty yards, which they say boats descending may with propriety run. Ostrander, the pilot of the Georgia, who was at the wheel at the time of the collision, says that his boat was about two hundred and fifty yards from the Kentucky shore when he first tapped his bell upon discovering the lights of the Dresden. The other pilot of the Georgia, by the name also of Ostrander, who came out upon deck upon the ringing of the bell, says the Georgia was about one hundred and fifty yards from the Kentucky shore, and that this is the usual and proper place for descending boats. A large majority of the witnesses testify in favor of this distance, which is one hundred yards less than the pilot at the wheel declares his boat was running at the time of the occurrence. The witnesses on the part of the Dresden, generally testify that the collision occurred from two hundred and fifty to three hundred yards from the Kentucky shore. The pilots who have been examined, vary in their opinions as to the proper course of descending boats. Some of them are of opinion that it is best to run the bend, except in high water, while others, and those, I think, the most experienced, and therefore most to be relied on, are decidely in favor of running up along the bar or Missouri shore. Among these last is Reuben Miller, who has been a pilot for thirty years. His opinion certainly is in accordance with the general rule of navigation on the Mississippi river, for there is perhaps no general rule on this subject which is more uniformly followed by pilots, than that which requires the descending boat to run down the bend where she finds the strongest current and the deepest water, and the ascending boat to hug the bar as close as she can with safety, in order to avoid the resistance of the current. I am satisfied that the pilot of the Dresden was acting in accordance with this general rule when he tapped his bell twice to indicate his determination to run up the bar shore. He seems to be a man of great experience in his business, having followed it for seventeen years. The same cannot, I think, with propriety be said of the pilot of the Georgia. According to the testimony of his brother he is only twenty-four or twenty-five years of age, and has been piloting as a regular pilot only four years. He seems to have been deficient in the coolness and skill necessary for the emergency in which he was suddenly called to act. There seems to have been no necessity for excitement or confusion. He admits that a descending boat could be seen on the river near the place of collision at the distance of five miles, and that he saw the lights of the Dresden at the distance of four miles. He declares that he gave the first signal of one tap, indicating his determination to steer to the right, when the Dresden was at the distance of four hundred yards. It is doubtless true that he gave the first signal, but I am satisfied from the testimony of those on board the Dresden, that it was not heard by the pilot of the latter boat. It was not even heard by the engineer of the Georgia. There was, therefore, no error committed by the pilot of the Dresden in giving two taps to indicate his determination to take the bar shore, and it was clearly the duty of the descending boat to go to the larboard after this last signal of two taps was answered by her. It seems to have been given in time to have avoided the collision. The determination of the ascending boat must have been apparent even before the signal was given, by the very fact that she was from two hundred and fifty to three hundred yards from the Kentucky shore, and was steering for the Missouri shore. There seems to be no difference of opinion among the pilots who were examined, in relation to the duty which devolved upon the pilot of the Georgia to steer to the larboard as soon as he responded to the signal in a manner to denote his acquiescence in its propriety. The duty of doing the maneuvering, as usual, devolved upon the ascending boat, and there is a fair ground for believing that his duty would have been successfully performed, if proper precautions had been taken by the descending boat to shut off steam and keep to the larboard. I am by no means satisfied that the headway of the Georgia was stopped at the time of the collision. The pilot declares that he is not sure that the starboard engine was not in motion, though he testifies that he rang the bell to stop it. I am by no means satisfied, therefore, that the libelant's boat was not in fault; and so far from having made out his case so clear as to place the justice of his demand beyond a reasonable doubt, my opinion, after a thorough examination of the evidence, is decidedly in favor of the course pursued by the officers of the Dresden.

My attention has been particularly directed to rule 3 of the rules and regulations adopted by the board of supervising inspectors in compliance with the provisions of the twenty-ninth section of the act of congress, entitled "An act to amend an act entitled an act to provide for the better security of lives of passengers on board of vessels propelled in whole or in part by steam, and for other purposes," approved the 30th of August, 1852. These rules and regulations were adopted on the 29th of October, 1852. By rule 3, to which reference has been made, the pilot of the descending boat is required to keep the channel and check his engine, using only sufficient steam to give her steerage, until the following signals are given and answered:

"It shall be the duty of the pilot of the ascending boat, as soon as the other shall be in sight and hearing, to sound his bell once if he shall wish to keep his boat to the right; and it shall be the duty of the pilot of the descending boat to answer the same promptly by one stroke of the bell; if not answered, the pilot of the ascending boat shall strike his bell again and again, at short intervals, until heard and answered by the pilot of the other boat. But if the pilot of the ascending boat shall wish to keep his boat to the left, he shall strike his bell twice, and it shall be the duty of the pilot of the descending boat to answer the same by two strokes of his bell, and both boats shall be steered accordingly. The first signal shall be given by the pilot of the ascending boat, and it shall be the duty of the other to answer promptly; but in case the pilot of the ascending boat does not make the signal in proper time, the pilot of the descending boat shall make the signal, and the other shall answer promptly."

The rule is evidently intended, by the language employed, to apply to the navigation of "narrow channels or in fogs." It is, in my judgment, quite absurd to speak of the channel of the Mississippi river at any stage of water as a narrow channel at any point below the mouth of the Ohio; and we are told by the old and experienced pilot, Reuben Miller, who was examined in this case, that on that part of the river where the collision occurred he would run an ascending boat four hundred yards from the Kentucky shore, and that there is that width of what he terms good water. There was no fog on the river at the time of the collision. It had been raining, but that had ceased and the night was clear. The witness Miller also states that "descending boats come down near the Kentucky shore. Boats going up very frequently keep in the bend, but if there is a boat coming down, they keep near the bar."

The rule adopted by the supervising inspectors refers, doubtless, to the channels of the narrow shoots as they are technically termed by the river-men, which running off from the main channel form islands, and fall again into it. These in a high stage of water are frequently navigated by steamboats, because they greatly abridge the distance. A channel of four hundred yards cannot reasonably be regarded as a narrow channel, and no difficulty could possibly arise in navigating such a channel on a clear night if pilots understand their duty, and are familiar with the customs of the river. But I do not understand that the rule invoked, even if applied to the main channel of the Mississippi, as well as to its tributaries and narrow shoots, was designed to change the rule of navigation already well recognized. In the first place, has the libelant in this case shown beyond a reasonable doubt, that he kept the channel

and checked his engine, using only sufficient steam to give her steerage, until the signals were given and answered? In this case she gave the first signal which was not heard by the ascending boat; but it does not appear that when she gave the signal she at once checked her engine, and used only sufficient steam to give her steerage. Her own pilot testifies that he did not ring to stop the engines until the signal of two taps was given by the pilot of the ascending boat, and it is extremely doubtful whether or not the starboard engine of the Georgia was stopped at all. If those of the witnesses on the part of the Dresden, who speak of this alleged fact, are to be believed, it is certain that it was not. So far as it relates to the conduct of the pilot of the Dresden, the rule seems to have been substantially complied with. He did not answer the first signal of the Georgia, because he did not hear it. He gave his signal of two taps, not indeed as soon as the Georgia was in sight and hearing, but when she was between three and four hundred yards off; and this was amply sufficient to enable the descending boat to avoid the collision if she had taken all necessary precautions. It must be remembered that the ascending boat is always required to do the maneuvering. She is not by the general rule of navigation, to stop her engine. In the case before the court, however, the Dresden seems to have done so to break the force of the collision, when it was apparently unavoidable.

I am of opinion that the libelant has not presented such a case by the evidence on the record, as should entitle him to a decree for the damages he has sustained. I consider those damages to be the result of the negligence and want of skill on the part of the pilot of his own boat; and his libel must therefore be dismissed, with costs.

Subsequently on the part of the libelants, application was made for a rehearing.

McCALEB, District Judge, delivered the following additional opinion:

I have again examined the evidence in this case, and after mature consideration must adhere to the opinion already given. The declarations of witnesses in reference to distances must be received with many grains of allowance. We know how difficult it must be to determine the precise position of boats in the night time, and how uncertain must be conclusions drawn by witnesses who speak of objects discerned at a distance. In giving my opinion, therefore, I do not pretend that the distance of the Dresden from the Kentucky shore was precisely that which the witnesses say it was. It may have been one hundred or one hundred and fifty yards less. But what I designed to convey in the opinion already rendered, is, that she had proceeded sufficiently far to

indicate her determination to take the bar shore even before she rang her bell, and that she was making the proper exertions to accomplish her object when the collision occurred.

The new trial is refused.